MAKOSKI v. UNION BAG & PAPER CO.

(Supreme Court, Appellate Division, Third Department. December 30, 1909.)

1. MASTER AND SERVANT (§ 289*)—INJURIES TO SERVANT—JURY QUESTION—SERVANT'S KNOWLEDGE OF DANGER.

In an action for a servant's death by falling through a chip bin into a pulp digester while pushing chips therein, the amount of knowledge intestate had acquired as to the hole in the bin and the manner of its construction while assisting in adjusting the chip hopper *held* for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1111; Dec. Dig. § 289.*]

2. MASTER AND SERVANT (§ 285*)—INJURIES TO SERVANT—JURY QUESTION—CAUSE OF INJURY.

In an action for a servant's death, claimed to have been caused by falling through a chip bin into a pulp digester, into which he was pushing chips, whether intestate met his death by falling through an opening in the chip bin into the digester *held* for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1016; Dec. Dig. § 285.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

3. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—SUFFICIENCY OF EVI-
DENCE—NEGLIGENCE.

In an action for a servant's death by falling through a chip bin into a
pulp digester while pushing chips therein, evidence *held* to sustain a find-
ing that defendant was negligent in putting intestate to work there with-
out instructing him as to hidden dangers.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 972;
Dec. Dig. § 278.*]

4. MASTER AND SERVANT (§ 281*)—INJURIES TO SERVANT—SUFFICIENCY OF EVI-
DENCE—CONTRIBUTORY NEGLIGENCE.

In an action for a servant's death by falling through a chip bin into a
pulp digester while pushing chips therein, evidence *held* to sustain a find-
ing that intestate was not guilty of contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 987–
996; Dec. Dig. § 281.*]

Cochrane, J., dissenting.

Appeal from Trial Term, Saratoga County.

Action by Joseph Makoski, as administrator, against the Union Bag
& Paper Company. From a judgment of nonsuit, plaintiff appeals.
Reversed, and new trial granted.

Argued before SMITH, P. J., and CHESTER, KELLOGG, SEW-
ELL, and COCHRANE, JJ.

Irving W. Wiswall (Edgar T. Brackett, of counsel), for appellant.

Rockwood, Scott & McKelvey (Nash Rockwood, of counsel), for
respondent.

JOHN M. KELLOGG, J. The plaintiff alleges that his son, the
intestate, by reason of the defendant's negligence, fell through its chip
bin into a pulp digester where he was killed and "eaten" up by the acids
therein contained. Chip bin No. 1 is a circular wooden tank, about 25
feet in diameter and about 15 feet high from floor to roof. The bot-
tom of the bin is about parallel with its top, and above it is a floor
slanting from the side towards an opening in the center, at an angle at
its steepest part of about 45 degrees. In the center the floor slants
down in a kind of a chute to an opening of about 24 by 26 inches, and
below this opening is a movable funnel or hopper which connects the
chute with the top of the digester below. The digester is a large
cylindrical tank, lined with brick and lead, with a capacity of 50,000
gallons of liquid. The bin is filled with small wooden chips, which run
down the chute into the digester, which, when the bin is full, is filled
with powerful acids and heated with steam to a temperature of about
300 degrees Fahrenheit. The chips are then cooked in this digester for
10 or 11 hours. The slanting floor of the bin and the chute are very
smooth. Inside the bin is a flat platform about 5 by 10 feet, upon
which a man stands with a fork and forces the chips down into the
chute and prevents their clogging; thus insuring a steady flow until
the contents of the bin are discharged.

The intestate was an employé in the mill, but had had nothing to
do with a chip bin until the day in question. The "cooker," Battger,
required a man to go into the bin, and the intestate was sent. The
cooker was a Swede, the intestate a Polander, and neither could un-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

derstand the language of the other. From the evidence the jury would have been justified in finding the following additional facts: The cooker took the intestate into bin No. 4, and with a pitchfork and by his motions showed him what to do, and then left him to discharge the bin, which he did in about half an hour. Bin No. 4 was smaller than No. 1, and constructed somewhat differently. It sloped inwardly from the top towards the opening in the bottom. The opening was about 12 inches square, and there was no flat platform upon which the employé stood. After bin No. 4 was discharged, the cooker took the intestate to bin No. 1, and together they lifted the hopper from the floor of the mill, and adjusted it between the chip bin and its digester. It is not clear just how much the intestate then saw of the opening in the bin above him, or what inferences he drew from it, or from the apparently flat bottom of the bin. They then climbed the ladder leading into the bin. The cooker descended the ladder on the inside. He dug away some of the chips over the platform, leaving it covered with chips to a depth of four or five feet. With a fork he then indicated to the intestate what was to be done. He then ascended the ladder and the intestate descended into the bin, and, when the cooker saw him at work properly, he left him there. A 16 candle power electric light was at the top of the bin and fairly lighted the inside. A few minutes after, at about 10 minutes of 11 o'clock, the cooker, who was about to leave for the night and to be replaced by another cooker, ascertained that the intestate was at work in the bin. He told Telling, the cooker taking his place, that there was a green man in the bin, a Polander, who could not speak English. About 10 minutes after this information, Telling was informed that the chips were not running from bin No. 1, and that no one was at work therein.. He sent another man into the bin, who discharged its contents until the digester was full, the acids and steam were turned on, and the contents of the digester cooked for 10 or 11 hours in the usual manner. In the morning the intestate's father came to the mill inquiring for his son, and, upon investigation, his coat, hat, and dinner pail were found in their accustomed place, but nothing could be learned of his whereabouts, and he was not seen alive thereafter. The digester was immediately cleaned, and its contents carefully scrutinized, among which were found three human teeth, a molar, bicuspid and an incisor, and a human patella, the right kneecap. The action of the contents of the digester would be such that it would naturally eat up and destroy the human body, including the bones. The bones found were those which would naturally be destroyed last. The digester had been thoroughly cleaned before the contents of the chip bin were emptied into it that day.

It is urged by the defendant that the facts stated are not sufficient evidence to justify a finding that the plaintiff's intestate was killed in the digester, and that the evidence as to the fork which he is supposed to have had tends to show that he probably left this bin in the way he entered it. Battger swears that the night following, 20 hours after the disappearance of the intestate, McKinnon, superintendent of the defendant, "sent me after the fork. I found it on top of the bin." He swears it was the same fork the intestate had; that there was red

paint upon it; that the handle was split somewhat, and that the next time it was used it broke off. The evidence is not entirely satisfactory about the fork. Two forks are at each bin, usually near the bottom of the stairs when not in use, although sometimes a man leaving the bin leaves the fork on top of the bin at the place where Battger swears he found this fork. The evidence shows that two or three men were at the bin after the intestate. No one seems to have seen this fork on top of the bin until McKinnon sent Battger after it. The evidence of one witness indicates that the forks were all alike, and none of them had paint on them. The witnesses were all employés of the defendant, and probably favorable to it. It may be that Battger was mistaken about the identity of the fork. It may be that Telling in going into the bin was mistaken in saying that he did not take this fork with him. It is not quite clear whether Telling took a fork which he had which came from some other place in the mill, or whether he took one of the regular forks belonging to this bin. It was a fair question for the jury what effect, if any, should be given to the testimony as to the fork. It was also a fair question for the jury to determine how much knowledge the intestate acquired as to the hole in the bin, and the manner of its construction while he was assisting in putting the hopper between the bin and the digester. There is no evidence suggesting any source from which the human teeth and bones could enter the digester except as we may infer that they were the remains of the intestate. It does not appear that upon other occasions any like bones were ever found. The disappearance of the intestate and the finding of the human teeth and patella in the digester is at least some evidence that the facts are related to each other, and that the intestate met his death there. The evidence of the defendant's employés indicates that the slide between the chute and the digester was half closed. That would reduce the open space to about 12 by 23 inches, and it was a fair question for the jury whether, if the opening was half closed, a man of the intestate's form could and did pass through it. The intestate apparently had no knowledge of this bin, except what he acquired while aiding in lifting on the hopper and such as he gained by working in bin No. 4, where the opening at the bottom was not to exceed 12 inches square and which would not permit a thick-set man about 22 inches across the shoulders to pass through. There was no platform in bin No. 4, and he had no information that there was one in bin No. 1. If the opening at the bottom in bin No. 1 had been the same as in bin No. 4, it is probable the intestate would not have met his death. The jury had the right to say that the defendant was negligent in putting the intestate into this place without instructions as to the hidden or unknown danger which existed. His experience in bin No. 4, so far as it gave him any information, gave him false information as to the situation in bin No. 1. Bin No. 4 might have been entirely safe, while the situation in bin No. 1 was dangerous to one not acquainted with all the facts.

Sufficient facts existed to warrant a determination by the jury that the defendant's negligence caused the intestate's death. It is evident that if the defendant was guilty of negligence in sending the intestate into this bin, without informing him of the dangers and of the pre-

cautions necessary to guard against them, that he was not called upon to exercise any great care to avoid dangers as to the existence of which he had no knowledge or information. Not knowing the situation, he could not guard against unsuspected dangers. The evidence would therefore warrant the jury in saying that no negligence of the intestate contributed to his death.

The court should have submitted the case to the jury. The judgment should therefore be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur, except COCHRANE, J., dissenting in opinion.

COCHRANE, J. (dissenting). If the deceased lost his life in the performance of his duty, the pitchfork which he was using should have been found within the chip bin where he was working, unless it passed down into the digester, in which case its tines would undoubtedly have been found with the bones of the deceased. Cornell, a witness for the plaintiff, looked into the bin from the top, and discovered the disappearance of the deceased. Driscoll, another witness for the plaintiff, was sent into the bin a few minutes after the disappearance of the deceased to complete his task, and was thus engaged about 15 minutes in working the chips into the digester. Neither of these witnesses discovered the fork which the deceased had been using. The only inference which I can draw from this record created as it is entirely by the plaintiff's witnesses is that the deceased must have removed the pitchfork from the bin and was not doing the work which he was required to do when he fell into the digester. It is not merely that a fork identified as the one which the deceased was using was subsequently found at the top of the bin, but the more forcible argument to my mind is that no fork whatever was found within the bin, and no trace of any fork was found in the digester. If, as I think, the evidence points irresistibly to the conclusion that the deceased had removed the fork from the bin, then it is impossible to account for this accident. The theory that he fell from the ladder is just as plausible as any other theory. Assuming, as I do, the negligence of defendant, and that the deceased met his death in the digester, nevertheless, if I am correct in my assumption that the evidence shows unmistakably that the deceased was not engaged in working the chips into the digester when he fell therein, then the conclusion follows that there is no connection between the defendant's negligence and the accident. The deceased may have fallen in some unforeseen and unaccountable manner for which no one was responsible or from his own contributory negligence. The circumstances are just as consistent with either of the latter hypotheses as with the theory that his death resulted from the negligence of defendant. The circumstances point nowhere except that they do show irresistibly that the deceased was not in the performance of his duty when he fell into the digester. The cause and manner of the accident are entirely conjectural and speculative, and there is in my opinion no warrant for submitting the case to the jury.